UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| IN RE ) | Bankruptcy Case |
| ) | No. 09-65328-fra7 |
| WILLIAM ROBERT PRUITT and ) | |
| KAY ANN PRUITT, ) | MEMORANDUM OPINION[1] |
| ) | |
| Debtors. ) | |

William Robert Pruitt **(Robert)** and Kay Ann Pruitt **(Kay)** (collectively "**Debtors**") filed a joint Chapter 7 petition on September 30, 2009. Two matters are currently before the court. The first is the Chapter 7 Trustee's (**Trustee)** motion for an order approving a settlement he has reached with the State of Oregon (**the State)**. Robert objected to that settlement and the matter was heard on August 31, 2010. The court took the matter under advisement pending resolution of the second matter, which was SunTrust Mortgage, Inc.'s (**SunTrust**) motion to substantively consolidate Robert and Kay's Chapter 7 estates. The United States Trustee (**UST**) as well as the Trustee supported that motion. Debtors as well as creditor Judy Snyder opposed it. An evidentiary hearing was held on October 27, 2010, after which the court took the matter under advisement. Both matters are now ripe for decision.[2]

---

[1] This Memorandum Opinion is not intended for publication.

[2] The Hon. Albert E. Radcliffe initially heard both matters. Unfortunately, Judge Radcliffe passed away in January, 2011. The case was then reassigned to the undersigned judge. On March 3, 2011, I convened a status

(continued...)

MEMORANDUM OPINION-1

**Substantive and Procedural Background:**

Debtors have been married since August, 1992. It was the second marriage for each. They have one child together, a son, born in April, 1993. In 2005, Debtors, their son, and Kay's mother, Georgia Drennan (**Drennan**), lived in a house Debtors jointly owned on S.E. 24th Terrace in Ocala, Marion County, Florida. From time to time, Drennan would lend Debtors money for home improvements, to assist Kay in business ventures and for necessities. The house was subject to a mortgage under which Debtors were obligated.

Debtors' marriage has at times been troubled. In July, 2005, Debtors executed a Separation Agreement which recited they had agreed to an immediate and permanent separation in contemplation of a proceeding for dissolution "to be shortly filed" by Kay. It purported to divide Debtors' assets and liabilities. Robert would be responsible for paying then-accrued joint debt. Later-acquired property or liabilities were to be solely those of the party acquiring same, independent of any claim or obligation of the other. The Agreement provided for joint custody of Debtors' son, that he would reside with Kay, and that Robert would be afforded visitation rights. It also provided that Robert would pay as child support 20% of his net income from all sources beginning when he was fully employed but not less than 60 days from the Separation Agreement's date. Despite the Separation Agreement, Debtors continued to live together. They testified they did so in the best interests of their son, agreeing to stay together until after he graduated from high school, at which time they contemplated a divorce. They did not file any formal petition for court approval of the Separation Agreement.

Also in July, 2005, Robert executed a quitclaim deed to Kay of his interest in the S.E. 24th Terrace property. Robert testified that this deed constituted a lump sum payment of his equity in the home in

---

[2](...continued)
conference wherein all parties stipulated to me deciding the current matters on the record. As such, and pursuant to FRCP 63 (made applicable by FRBP 9028), I hereby certify that at all stages of the proceedings after reassignment, and in particular in entering the below findings of fact and conclusions of law, I have examined the pertinent record including the motions, memoranda in support and opposition thereto, hearings transcripts and admitted exhibits, and that upon their review and in light of the parties' stipulation, I find the instant matters may be completed without prejudice to the parties.

MEMORANDUM OPINION-2

satisfaction of his support obligations under the Separation Agreement. The quitclaim deed was recorded in the Marion County real property records on October 31, 2005, and re-recorded on November 4, 2005.

On November 8, 2005, Kay filed a "Petition for Support Unconnected With Dissolution of Marriage" in Marion County Circuit Court. The case was assigned to a magistrate. After a continuance, Debtors appeared at a hearing in March, 2006, after which the Magistrate issued written findings and recommendations: 1) designating Kay as the primary residential parent; 2) ordering Robert to pay permanent alimony of $400/mo. commencing October 1, 2006; and 3) ordering Robert to pay child support of $800/mo. also commencing October 1, 2006. The findings and recommendations also divided responsibilities for providing medical and life insurance for their son's benefit. The Magistrate's findings and recommendations were approved by a Circuit Judge by order entered in March, 2006 (**the Support Order**). Again, despite the Support Order's requirements, no monthly alimony or child support was paid. Kay testified that she obtained the Support Order as a form of insurance "in case something bad happened" between her and Robert. October 27, 2010, Hearing Ex. F at 82:10-13. Robert testified he considered his support obligations satisfied by the prior quitclaim deed of his interest in the S.E. 24th Terrace property.

Meanwhile, in February, 2006, Kay applied for an equity line of credit with SunTrust to be secured by the S.E. 24th Terrace residence. In relation thereto, SunTrust obtained an appraisal as of February 20, 2006, valuing the property at $490,000. Kay's application was approved and on February 24, 2006, she executed an Equity Line Account Agreement (**Equity Line**) for credit up to $198,000. Robert did not sign the Equity Line. The Equity Line was secured by a second mortgage (**the Mortgage**) signed by Debtors[3] on the S.E. 24th Terrace property. The Equity Line's proceeds were mainly used to pay debts and reimburse

---

[3] It is unclear why SunTrust required Robert's signature, as the real property records should have shown the 2005 quitclaim deed relinquishing his interest in the property.

MEMORANDUM OPINION-3

Drennan for sums advanced for construction of a "mother-in-law" apartment.[4] Debtors testified the proceeds were also used to build a swimming pool.[5]

By profession, Robert is an airport manager and for a time while in Florida managed Ocala's airport. He was let go from that job and afterwards worked as a real estate appraiser and agent. Kay worked for a time as a receptionist. She also sold Mary Kay cosmetics. Debtors also sold religious-themed wooden boxes. For a time, Roberts' real estate activities and Kay's cosmetic sales were conducted through "The Pruitt Group, Inc.," as were several other business ventures which never got off the ground. The wooden box sales were conducted through "Pruitt Enterprises" which Debtors owned. Aside from cosmetics sales, none of these businesses earned any significant income.

In June, 2007, Robert moved to Lake Charles, Louisiana to take a job with the Chenault International Airport Authority (**CIAA**) as Executive Director under a three year employment contract. Kay and Debtors' son stayed in Ocala until approximately October, 2007, when they followed Robert to Lake Charles. Disputes arose in Robert's new job and in November, 2007, his employment ended. In late November, 2007, Robert filed, through counsel Linda Guillory-Lee, a breach of contract action against the CIAA in the District Court of Calcasieu Parish (**the CIAA action**).[6] In that action, Robert alleged he was terminated without cause. The CIAA alleged Robert quit or abandoned his position and alternatively, his termination was with good cause. The CIAA Action was pending when Debtors filed their Chapter 7 petition.

After his employment terminated, Debtors and their son moved back to Ocala where again Robert worked sporadically in real estate. In January, 2008, the Pruitt Group through Debtors, quitclaimed its interest in a parcel of investment property to Drennan. At some point another Pruitt Group parcel was transferred to Drennan. Debtors testified these transfers were in partial satisfaction of the funds Drennan had

---

[4] The Notice of Commencement of work on the mother-in-law apartment was signed by Kay on June 23, 2004, and recorded by the contractor on July, 13, 2004. See October 27, 2010, Hearing Ex. 118.

[5] This testimony is somewhat suspect in that the initial Notice of Commencement of work on the pool was signed by Robert on March 15, 2003, and recorded by the contractor on March 17, 2003, see, October 27, 2010, Hearing Ex. 119, almost three years before the Equity Line was approved.

[6] At various times attorney Rudie Soileau assisted Ms Lee in the litigation.

MEMORANDUM OPINION-4

advanced them. In February, 2008, Robert started a business named Liberty Commercial Credit (**LCC**), later named "Direct Buy to You, LLC" (**Direct Buy**). LCC attempted to arrange financing for small businesses with bad credit histories. Direct Buy sold Mary Kay cosmetics on the internet. LCC never made any money. Robert again sought work as an airport manager. One of the positions was in Oregon.

In June, 2008, Robert was hired as the State Airports Manager with the Oregon Department of Aviation (**ODA**). Debtors, their son and Drennan moved to Salem, Oregon, where they lived in a home leased by Drennan. After moving to Oregon, Debtors quit making payments on the mortgages on the S.E. 24th Terrace property in Ocala. The first mortgagee ultimately foreclosed, holding the foreclosure sale in June, 2009. SunTrust received nothing on its junior lien from the sale.

Meanwhile troubles arose with the ODA. Robert's employment was terminated in October, 2008, under circumstances Robert believed were wrongful. Kay eventually found employment as an administrative assistant for a dental lab. In January, 2009, Kay began contemplating filing Chapter 7. In May, 2009, she consulted bankruptcy counsel and in June completed the paperwork to file Chapter 7. Meanwhile Robert was falling behind on his car payments as his only income was unemployment benefits. He hired attorney Judy Snyder to represent him on his wrongful termination claim against the State. In March, 2009, he issued a statutory notice of intent to sue, and in August, 2009, filed suit against the State in Marion County (Oregon), Circuit Court (**the Oregon Action**).

In September, 2009, Robert had a heart attack and was admitted to the hospital. He was released the next day and was put on heart medication. After one of his vehicles was repossessed and with increasing medical bills going unpaid, he decided to join Kay in filing a joint Chapter 7 petition.

Debtors filed their joint Chapter 7 petition on September 30, 2009. Up until then, and despite the Separation Agreement and Support Order, Debtors had not changed the way they handled their finances. Except for a brief time after Robert first began working in Lake Charles, Debtors continued to live together up until the filing. For the most part, they lived as typical married people do, maintaining joint bank

MEMORANDUM OPINION-5

accounts, sharing income and expenses, and through 2008 at least, filing joint tax returns.[7] Kay indicated she was "married" (not separated) on her Equity Line application. She did not immediately tell family or friends that she and Robert had "legally" separated. In fact she only told Drennan (with whom she is extremely close) years later.

Debtors' Schedule A listed the S.E 24th Terrace property (even though it had been sold at foreclosure sale three months earlier), showing a value of $312,000 with $400,000 owed against it. It also listed a timeshare in Cancun, Mexico with an "uncertain" value. Schedule B listed personal property totaling only $16,687.39, the main asset being a 2006 Hyundai valued at $10,000. Neither schedule indicated one way or another whether an asset was owned by Kay, Robert or jointly, except for a 401k retirement plan listed as Kay's and the Hyundai listed as Robert's. Neither the CIAA Action nor the Oregon Action were listed on Schedule B.[8] On Schedule C, Debtors claimed Florida exemptions for the full value of all assets listed on Schedule B except the Hyundai. Schedule D listed Independent Bank as secured on the Hyundai with a claim of $13,000. The IRS and Oregon Department or Revenue were listed as "Notice only" on Schedule E. Schedule F listed 27 general unsecured creditors with claims totaling $257,010.42. The largest creditor listed was SunTrust for $197,858.65 on the Equity Line. Except for SunTrust, none of the debts listed on Schedules D, E and F indicated one way or another if the liability was Kay's, Robert's or joint. The SunTrust listing indicated the liability was Kay's. Schedule J indicated shared monthly expenses. Neither The Pruitt Group nor Pruitt Enterprises were listed on the statement of financial affairs (**SOFA**) as businesses in which Debtors were principals within 6 years of the petition.

In the Oregon Action, discovery continued post bankruptcy and settlement negotiations began between Robert and the State. In October, 2009, the State offered Robert $650,000 to settle. The settlement included certain non-economic terms such as a neutral employment recommendation. Robert accepted the

---

[7] While in Oregon, aside from a joint checking account, Robert maintained his own checking account for a limited period.

[8] Robert testified in earlier proceedings in this case that he did not believe the actions needed to be included in his schedules until they were settled or reduced to judgment.

MEMORANDUM OPINION-6

offer. Both sides signed settlement documents and a settlement check was issued care of Ms Snyder. The Oregon Action was then dismissed by stipulation in late October, 2009. At the time both the State and Ms Snyder were unaware of Robert's bankruptcy. Post-settlement, Robert notified his bankruptcy counsel. On October 27, 2009, Debtors amended their Schedules A, B, and C and SOFA. Amended Schedule A deleted the S.E. 24th Terrace property. Amended Schedule B increased the amount in a checking account from $100 to $700, deleted the Hyundai, and added the Oregon Action, listed as Robert's sole property, and at a $650,000 value. Amended Schedule C remained the same except the increased checking account balance was exempted in full.[9] The response to SOFA #4 as to actions pending within one year of the bankruptcy filing was amended to include the Oregon Action. SOFA #5 was amended to indicate the Hyundai had been repossessed or surrendered to Independent Bank on September, 30, 2009, the date of the petition. SOFA #15 was amended to change the date the S.E. Terrace home was vacated from August to July, 2008.

Upon the filing of the amended schedules, the Trustee first became aware of the Oregon Action and made claim thereto as estate property. Upon notification of Robert's bankruptcy, the State took the position the settlement was null and void as violative of the automatic stay and involving the incorrect party in interest. It proceeded to rescind the settlement offer, stop payment on the check and move to set aside the stipulated judgment of dismissal.

As to the CIAA Action, Robert dismissed Ms Lee[10] and Mr. Soileau and attempted to settle the case directly. On or about November 9, 2009, Ms Lee recorded her attorney fee contract with Robert in the mortgage and conveyance records of Calcasieu Parish.[11]

---

[9] No party in interest timely objected to original or amended Schedule C, and thus the claimed exemptions have been allowed. Taylor v. Freeland & Kronz et. al, 503 U.S. 638, 112 S. Ct. 1644, 118 L. Ed. 2d 280 (1992).

[10] On October 29, 2009, Ms Lee obtained an order allowing her withdrawal as attorney of record.

[11] Although not briefed by any party, the court presumes this recordation was an attempt to create or perfect an attorney's lien on the proceeds of the CIAA Action under Louisiana law. It is unclear whether Ms Lee was aware of Robert's bankruptcy filing. In any case, the recordation was done without relief from the automatic stay.

MEMORANDUM OPINION-7

In December, 2009, Robert amended Schedule B to add the CIAA Action in an "unknown" value, listing it as his. He also amended Schedule D to add Ms Snyder as a secured creditor based on her asserted attorney's lien on the Oregon Action. Finally, he amended his response to SOFA #4 to add the CIAA Action as pending within a year of the Chapter 7 filing, changed his response to SOFA #15 as to when he vacated S.E. 24th Terrace back to August, 2008, and added "The Pruitt Group, Inc." and "Pruitt Enterprises" to SOFA #18 as businesses in which he was a principal within 6 years of the bankruptcy filing.

In the meantime, Robert moved to sever the joint Chapter 7 petition and convert his case to Chapter 13, in order to regain control of the Oregon Action. Judge Radcliffe heard that motion in January, 2010, and denied it. He based his ruling on <u>Marrama v. Citizens Bank of Massachusetts et. al.</u>, 549 U.S. 365, 127 S. Ct. 1105, 166 L. Ed.2d 956 (2007), finding Robert had acted in bad faith in several respects, the foremost being his omission of the Oregon and CIAA Actions from his original Schedule B, and the CIAA Action from his first amended Schedule B.

Also in January, 2010, the UST filed an adversary proceeding under various sections of 11 U.S.C. § 727(a)[12] to deny Debtors their discharge. Judgment by default has been entered against Robert. The proceeding against Kay has been abated pending the outcome of the instant matters.

After the motion to convert was denied, the Trustee and the State began negotiating settlement of the Oregon Action. A settlement of $300,000 with no non-economic terms was eventually reached. On March 23, 2010, the Trustee filed a Motion for approval of the settlement. Judy Snyder filed a written objection, the gist of which was that she claimed a perfected attorney's lien on the settlement proceeds and as such should be paid from such proceeds upon approval of the settlement. On May 12, 2010, Judge Radcliffe conducted a hearing on the motion as well as related matters. At that hearing, the Trustee announced a new settlement that he would be noticing which involved the $300,000 figure and approval of Snyder's fees of $100,000 which would be paid directly by the State instead of coming through the Chapter 7 estate. Judge Radcliffe announced displeasure with those terms as he believed they were an attempt to skirt bankruptcy court

---

[12] Unless otherwise noted, all subsequent statutory references are to Title 11 of the United States Code.

MEMORANDUM OPINION-8

oversight of Ms Snyder's attorney fee claim. As memorialized in a minute order entered May, 13, 2010, Judge Radcliffe ruled that the Trustee was to give notice to interested parties of any new settlement within 45 days, whereupon the court would conduct a hearing on its approval and take evidence on (among other things), the Trustee's due diligence, the merits of the underlying wrongful termination claim, and the reasons non-monetary terms weren't included.

The Trustee then proceeded to enter into yet another settlement with the State, again for $300,000, again with no non-economic terms, but this time with no built-in payment to Ms Snyder. On June 17, 2010, the Trustee filed the instant motion for approval of the settlement. The proposed settlement agreement was attached to the motion. One week later, SunTrust filed its motion for substantive consolidation.

The Trustee is administering the two estates as "asset" cases. The claims deadline ran on July 2, 2010. Twelve proofs of claim were timely filed. Of those: 1) $250,217.56 in unsecured claims were filed against Kay only, the largest being SunTrust's for $198,153.55;[13] 2) $19,950.84 in unsecured claims were filed against Robert only;[14] and 3) $6,826.01 were filed[15] against both Debtors.[16] Other scheduled claims for

---

[13] See, proofs of claim ## 2, 4, 5, 7 and 8.

[14] See, proofs of claim ## 1, 6 and 9. Proof of claim #1 was filed by Ford Motor Credit Company, LLC for $4,575.38 based on a three year pre-petition lease signed by Robert for a 2007 Ford Edge. The claim was technically filed as one "secured" by the Edge. However, it is uncontradicted Robert surrendered the Edge pre-petition. Further, the claim makes clear it is for a "lease deficiency" representing 11 remaining payments under the lease. (emphasis added). Judy Snyder has filed proof of claim #3 for an amount "to be determined" secured by an attorney's lien on the Oregon Action.

[15] See, proofs of claim ## 10, 11 and 12.

[16] I have drawn conclusions as to the Debtors' sole and joint liability both from the attachments to the proofs of claim and from the proofs of claim's line listing "Name of Debtor." I have presumed that if only one debtor's name was inserted, the claim is solely against that debtor while if both were entered, the claim is against both.

MEMORANDUM OPINION-9

which no proof of claim was filed total $17,008.62.[17] I will assume for argument's sake that both Debtors have liability on this "scheduled but no proof of claim" debt.

**Discussion**:

I will address the motion for substantive consolidation first, and then whether the proposed settlement should be approved.

<u>Substantive Consolidation</u>:

The filing of a petition for relief under Title 11 creates an estate consisting in general of all of the debtor's legal and equitable interests in property and all his and his spouse's interests in community property. §§ 541(a)(1) & (2). In a Chapter 7 case, if non-exempt assets exist, they are liquidated by the case trustee and distributed to creditors who have allowed claims under the distribution scheme set out in § 726. Although § 302(a) allows a husband and wife to file a petition together which is given only one case number, their two estates remain separate. <u>Ageton v. Cervenka (In re Ageton)</u>, 14 B.R. 833 (9th Cir. BAP 1981); <u>In re McAlister</u>, 56 B.R. 164 (Bankr. D. Or. 1985). In certain circumstances however it is appropriate to "substantively consolidate" the two estates. Substantive consolidation combines the assets and liabilities of the separate estates to create a single fund from which a common pool of claims is paid. <u>Alexander v.</u>

---

[17] This amount does not include a scheduled $14,000 debt to Bank of America. Bank of America filed one proof of claim (#12) against both Debtors for $6,631.78, which has been counted. The account number set forth in the proof of claim does not match the account number set forth on Schedule F. Even if the scheduled claim is not the same as Proof of Claim #12, thereby increasing the scheduled debt for which no proof of claim was filed to $31,008.62, my analysis as set out below would not change.

MEMORANDUM OPINION-10

Compton (In re Bonham), 229 F.3d 750, 764 (9th Cir. 2000).[18] Under § 302(b) the court determines the extent if any, to which the debtors' estates will be consolidated. McAlister, supra.

The standards for determining when it is appropriate to substantively consolidate the estates of a husband and wife have not been the subject of a great deal of appellate caselaw. In Ageton, supra, the Ninth Circuit's Bankruptcy Appellate Panel, citing § 302(b)'s legislative history, held that relevant factors include the extent of jointly held property and the amount of jointly owed debts. Id. at 835. The Ninth Circuit Court of Appeals in Bonham, supra then examined substantive consolidation of non-debtor corporations with an individual debtor accused of running a Ponzi scheme, holding the court should consider two factors:

> (1) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit; or (2) whether the affairs of the debtor are so entangled that consolidation will benefit all creditors. The presence of either factor is a sufficient basis to order substantive consolidation. The first factor, reliance on the separate credit of the entity, is based on the consideration that lenders structure their loans according to their expectations regarding the borrower and do not anticipate either having the assets of a more sound company available in the case of insolvency or having the creditors of a less sound debtor compete for the borrower's assets. Consolidation under the second factor, entanglement of the debtor's affairs, is justified only where the time and expense necessary even to attempt to unscramble them [is] so substantial as to threaten the realization of any net assets for all the creditors or where no accurate identification and allocation of assets is possible.

Id. at 766 (internal citations and quotations omitted). The language "benefit to all creditors" in the second factor doesn't mean each and every creditor. In re Stayton SW Assisted Living, L.L.C., 2009 WL 5173512,

---

[18] A distinction between "joint administration" and substantive consolidation should be made. Joint administration, permitted by FRBP 1015(b), and sometimes referred to as "administrative consolidation" is a "procedural tool permitting use of a single docket for administrative matters, including . . . the joint handling of . . . ministerial matters that may aid in expediting the cases. Used as a matter of convenience and cost saving, it does not create substantive rights." Reider v. F.D.I.C. (In re Reider), 31 F.3d 1102, 1109 (11th Cir. 1994)(internal citations omitted). By contrast, "[b]ecause of the dangers in forcing [by the pooling of assets and liabilities] creditors of one debtor to share on a parity with creditors of a less solvent debtor . . . substantive consolidation is no mere instrument of procedural convenience . . . but a measure vitally affecting substantive rights." Union Savings Bank v. Augie/Restivo Baking Co. Ltd. (In re Augie/Restivo Baking Co. Ltd.), 860 F.2d 515, 518 (2nd Cir. 1988) (internal citations and quotations omitted).

MEMORANDUM OPINION-11

*5 (D. Or. 2009). "Rather, it means benefit to the creditor body as a whole." Id. Consolidation should be used "sparingly." Bonham, supra at 767 (internal quotation omitted).[19]

While Bonham concerned consolidation in the business context, I find its tenets applicable in the "spousal" context. Applying the Bonham test, the first inquiry is whether creditors dealt with the Debtors as a single economic unit and did not rely on their separate identity in extending credit. As noted by the above summary of the proofs of claim, Debtors' creditors were aware of each's separate identity and creditworthiness. This especially holds true for SunTrust's claim, which is by far the largest. Bonham's alternative prong examines whether the Debtors' affairs are so entangled that consolidation will benefit the creditor body as a whole. Consolidation under this prong is "justified only where the time and expense necessary even to attempt to unscramble . . . [their affairs is] so substantial as to threaten the realization of any net assets for all the creditors or where no accurate identification and allocation of assets is possible." Bonham, supra at 766 (internal quotation omitted). The proponents of consolidation have failed to prove this alternative ground. Through extensive discovery in prosecuting the instant motion they have in fact "unscrambled" Debtors' financial affairs. See, In re Avery, 377 B.R. 264, 270 (Bankr. D. Ak. 2007) (substantive consolidation denied where financial affairs of the two estates had been disentangled during the pendency of the motion). At this point, the assets and debts of Kay and Robert's respective estates are well-defined. To the extent they are not, net recovery is neither threatened nor allocation impossible.

Ageton looks to the existence and extent of joint liabilities and assets. As to the latter, substantial identity is in large part a moot issue, as most assets have been claimed fully exempt with no objection thereto. The only non-exempt assets identified by the parties are the CIAA and Oregon Actions and the Cancun timeshare. The timeshare is admittedly jointly owned. However, no evidence was adduced as to its value. Further, at the present, almost 20 months post-petition, the Trustee has taken no steps to administer

---

[19] In appropriate circumstances consolidation may be allowed nunc pro tunc the date of the petition's filing. Bonham, supra at 771.

MEMORANDUM OPINION-12

it.[20] The CIAA Action is in essence a joint asset. It accrued in Louisiana, a community property state, LSA-C.C. Art. 2334 et. seq., and is based on breach of contract. Under Louisiana law, such causes of action accruing during the existence of the community are community property. Saacks v. Saacks, 708 So.2d 1077 (La. App. 5 Cir. 1998); see also, Futch v. Futch, 643 So.2d 364 (La. App. 2 Cir. 1994) (to extent a property interest derives from spouse's employment during existence of the marriage, it is a community property asset).[21] No evidence was adduced as to the CIAA Action's value, and the Trustee is not administering it. Based on the record, valuing the timeshare and the CIAA Action at this juncture would be purely exercises in speculation.

The other non-exempt asset is the Oregon Action. It accrued in Oregon, which is not a community property state. In Oregon, spouses may hold property acquired during the marriage separately. ORS 108.060; Kowalewski v. Kowalewski,, 227 Or. 45, 58, 361 P.2d 64, 70 (1961). The Oregon Action accrued to Robert only. It resulted from his employment and the termination thereof. The UST and Trustee have asserted Kay may have an equitable interest in the Oregon Action because she helped support Robert from time to time including after his termination from employment by the State, but cite no authority for this proposition. Even if such an equitable interest existed, despite having the burden of proof, there is no evidence as to how much that interest is worth. Thus, for purposes of the present motion, I find the Oregon Action is Robert's only. And, although not presently liquidated, based on the initial settlement offer of $650,000, the subsequent offer of $300,00 and the evidence adduced at the August 31, 2010, hearing (discussed below), I find it has substantial value. Indeed, but for that value, it is likely SunTrust's motion would not have been filed.

As to the degree of joint debts, as noted above, the claims file and schedules indicate over $250,000 in unsecured claims against Kay only, approximately $20,000 against Robert only, and approximately

---

[20] Debtors' Schedule A listed the timeshare's value as "uncertain."

[21] No party has argued and the court has thus not considered whether the CIAA Action lost its status as community property when Debtors returned from Louisiana to Florida and eventually to Oregon.

MEMORANDUM OPINION-13

$24,000 against both Debtors. Thus, only approximately 8% of the total debt is joint. SunTrust however argued for the first time at the evidentiary hearing on the consolidation motion that in fact Robert has liability on its $198,000 plus claim. SunTrust relies on verbiage in the Mortgage (which both Debtors signed) rather than the Equity Line (which only Kay signed) to establish such liability.

The Mortgage in a paragraph headed "Payment and Performance" provides that "[e]xcept as otherwise provided in this Mortgage, Borrower[22] shall pay to Lender all Indebtedness[23] secured by this Mortgage as it becomes due, and Borrower and Grantor[24] shall strictly perform all Borrower's and Grantor's obligations under this Mortgage." The Mortgage then enumerates multiple obligations of the Grantor including but not limited to:1) maintaining the property [S.E. 24th Terrace] in good condition; 2) promptly performing all repairs, replacements and maintenance necessary to preserve the property's value; 3) complying with environmental laws and other governmental regulations; 4) refraining from causing a nuisance; 5) refraining from committing waste; 6) paying all taxes, assessments etc. levied against the property; and 7) procuring and maintaining insurance on the property.

Finally, the Mortgage provides in a section headed "Joint and Several Liability":

> All obligations of Borrower and Grantor under this Mortgage shall be joint and several, and all references to Grantor shall mean each and every Grantor, and all references to Borrower shall mean each and every Borrower. This means that each Borrower and Grantor signing below is responsible for all obligations in this Mortgage.

SunTrust argues this provision imposes liability on Robert for the amounts advanced under the Equity Line. I disagree. The Mortgage provides that it "will be governed by federal law applicable to Lender [SunTrust] and, to the extent not preempted by federal law, by the laws of the State of Florida . . . ."

---

[22] "Borrower" is defined as "KAY A PRUITT" and includes all co-signers and co-makers signing the Credit Agreement [Equity Line] and all their successors and assigns."

[23] "Indebtedness" is defined as liability under the Equity Line "and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Lender to enforce Grantor's obligations under this Mortgage . . . ."

[24] "Grantor" is defined as "KAY A PRUITT AND WILLIAM PRUITT."

MEMORANDUM OPINION-14

The parties point to no federal law governing the construction or interpretation of the Mortgage. As such, the court will examine Florida law. Under Florida law, the rules of contract interpretation apply to mortgages. Sims v. New Falls Corp., 37 So.3d 358, 361 (Fla. App. 3 Dist. 2010). The intentions of the parties govern a contract's construction and interpretation. Thomas v. Vision I Homeowner's Assoc., 981 So.2d 1 (Fla. App. 4 Dist. 2007). Absent an ambiguity, the contract's language is the best evidence of the parties' intent, and the language's plain meaning controls. Gibney v. Pillifant, 32 So.3d 784, 785 (Fla. App. 2 Dist. 2010). An ambiguity results when contract language may reasonably, Herpich v. Estate of Herpich, 994 So.2d 1195, 1197 (Fla. App. 5 Dist. 2008), or fairly, Hinely v. Florida Motorcycle Training, Inc., __ So.3d __, 2011 WL 1815145, 2 (Fla. App. 1 Dist. 2011), be interpreted in more than one way. If an ambiguity exists, the court may consider extrinsic evidence as well as rules of construction to interpret the ambiguous language. Herpich, supra. When ambiguity remains, an ambiguous term is to be construed against the drafter. Arriaga v. Florida Pacific Farms, L.L.C., 305 F.3d 1228, 1247-48 (11th Cir. 2002). Courts should construe a contract "as a whole, giving effect to all its provisions, in a manner which accords with reason and probability." Gulf Power Co. v. Coalsales II, L.L.C., 661 F. Supp.2d 1270, 1275 (N.D. Fla. 2009). "Whenever reasonable, the court construes the express terms of the contract to be consistent with any course of performance, course of dealing or usage of trade." Id. As a general rule, a mortgagor who obligates himself in the mortgage to pay the underlying debt which the mortgage secures may be personally liable thereon even though he did not sign the underlying debt instrument, if the mortgage provides a "clear, independent and unequivocal promise to pay . . . ." Ehrlich v. Mangicapra, 626 So.2d 702, 704 (Fla. App. 4 Dist. 1993).

Here, the Mortgage's clear language does not impose personal liability on Robert. Alternatively, his liability is at best ambiguous. First, both the "Payment and Performance" paragraph as well as the definition of "Indebtedness" differentiate between Kay's obligation to pay the Equity Line and Debtors' joint "obligations under this Mortgage," seven of which are enumerated above. If the obligation to pay the Equity Line was subsumed as an "obligation under this Mortgage" then the portion of the definition of

MEMORANDUM OPINION-15

"Indebtedness" imposing liability upon Kay for the Equity Line would be surplusage. Gulf Power, supra (court should endeavor to give effect to all provisions of a contract)(emphasis added). The "Joint and Several liability" paragraph continues this distinction, referencing the Debtors' joint and several liability only for "[a]ll obligations . . . under this Mortgage" and "all obligations in this Mortgage." That these provisions indicate Kay only was liable on the Equity Line is buttressed by the parties' course of performance. Id. Here, Kay had to complete a lengthy Uniform Residential Loan Application to obtain the Equity Line, which she alone executed. The Equity Line contained the disclosures required by the Truth In Lending Act (TILA) for open end credit secured by the borrower's principal dwelling. See, 15 U.S.C. §§ 1637 and 1637a. Presumably SunTrust intended to follow the law. It appears that the parties did not intend that Robert be liable on the Equity Line since there is no evidence that Robert was provided with the TILA disclosures.[25] Finally, even assuming the Mortgage was ambiguous, SunTrust has presented no extrinsic evidence indicating Robert has liability under the Equity Line. SunTrust drafted the Mortgage and any ambiguity must be construed against it. Arriaga, supra. I conclude on the evidence before me that Robert is not liable on the SunTrust claim, and that there is thus no substantial overlap between the Debtors' liabilities.

The facts at bar are similar to those in In re Birch, 72 B.R. 103 (Bankr. D. N. H. 1987) which involved a joint Chapter 7 petition. There, the wife's estate contained $50,000 derived from settlement of a fraudulent conveyance suit brought by the Chapter 7 trustee against the wife and her father to whom she had quit-claimed a joint interest in a 60 acre parcel pre-petition.[26] Otherwise there were no non-exempt assets in either the wife's or husband's estate. The wife had fairly minimal debts and likely would be entitled to a surplus. The largest portion of the debt was against the husband-only deriving from a sole proprietorship

---

[25] Ordinarily, disclosure to only one "primary" obligor is sufficient. 15 U.S.C. § 1631(a). However, when the transaction is subject to rescission under 15 U.S.C. § 1635 because the extension of credit is secured by the consumer's principal dwelling as here, disclosures must be made to all who pledge an ownership interest in their principal dwelling as security. See, 12 C.F.R. §§ 226.17(d); 226.23(a)(1); and 226.2(a)(11).

[26] The wife had acquired her share of the 60 acres before she was married. There was no dispute it was her separate property and thus the proceeds derived from avoiding its transfer was her Chapter 7 estate's separate property.

MEMORANDUM OPINION-16

lumber business he had run pre-petition. With only one exception, there was no indication any of the husband's business creditors relied on the wife's separate credit or property in making their loans or advancing credit. The court noted caselaw allowing substantive consolidation only when the inter-relationship of the joint debtors' debts and assets were so hopelessly obscured that they could not be unscrambled, or similarly when the debtors' affairs are so intermingled that their respective assets and liabilities could not be separated. Id. at 106. It also noted factors such as the amount of jointly held debt and assets. In denying a motion to substantively consolidate brought by the husband's business creditors, the court found it could easily separate the wife's pre-petition joint interest in the 60 acre parcel (and the $50,000 proceeds derived therefrom). It found the possibility of a surplus to the wife did not prohibit keeping the estates separate. Further, it found that even though the income from the husband's business was funneled to both debtors through joint accounts and used for family purposes (and thus inter-mingled), that fact alone did not require substantive consolidation, as all such family assets were "exempt and would not result in any distribution to creditors regardless of consolidation." Id. at 107. The court found the husband's business creditors could have protected themselves by asking the wife to co-sign or guarantee the debt. Similar findings and conclusions are appropriate in the case at bar.[27]

The court acknowledges Robert's behavior in this case has been less than stellar. He has however suffered the consequences by being denied the right to convert to Chapter 13 (and thus control the CIAA and Oregon Actions) and having his Chapter 7 discharge denied. The Trustee, UST and SunTrust would like the court to impose one more consequence by requiring that his estate's assets pay his wife's debts. Under the facts at bar, I cannot go that far.

Motion to Approve Settlement:

---

[27] Balancing the interests of the estates through a claims process is likely to be more precise, and more equitable, than consolidation. The consequences to SunTrust and Kay's other creditors of keeping the estates separate are ameliorated by any claim Kay's estate may have against Robert's estate and/or against Robert personally for support under the Separation Agreement and the Support Order or both. Robert's assertion that his support obligations were satisfied by the 2005 quitclaim of his interest in the S.E. 24th Terrace property is questionable. If the Trustee determines that Kay's estate has a claim against Robert or Robert's estate, it might be necessary for the UST to appoint separate trustees.

MEMORANDUM OPINION-17

In determining whether to approve a settlement proposed by a trustee, bankruptcy courts must consider the following factors:

> (1) the probability of success in the litigation;
> (2) the difficulties, if any, to be encountered in the matter of collection;
> (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and
> (4) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

Martin v. Kane (In re A & C Properties), 784 F.2d 1377, 1381 (9th Cir. 1986). The Trustee has the burden of proof. Id. Here, he has failed to meet his burden relating to factors ##1 and 3.[28] The evidence (or lack thereof) admitted at the August 31, 2010, hearing quite simply leaves me guessing as to what exactly is being settled or compromised. No copy of the complaint filed in the Oregon Action or the tort claims notice which preceded its filing was introduced.[29] Further, there was no description in the testimony of the particulars of the claims being made in the Oregon Action. The only evidence was that (1) the claims were based on retaliation against Robert for "blowing the whistle" on [a] certain State aviation employee[s] for questionable leasing practices, and (2) that, after the original settlement, discoveries regarding Robert's credibility significantly diminished the claim's value.

The parties appear to take the position that liability is a given, and that the only controversy is the measure of damages. Even so, the current record requires too much speculation on the part of the court. Because I cannot ascertain the nature (much less the validity) of the claim, or its value, it follows I cannot ascertain the probability of success in the litigation, or the complexity of the litigation involved, and the

---

[28] As to factor #2, I presume that any judgment obtained against the State would be collectible. As to factor #4, I am of course aware that with the denial of substantive consolidation, $300,000 will likely pay all of Robert's creditors in full. However, that does not lessen the Trustee's burden of proof under A & C, given Robert's stake in any surplus.

[29] The tort claims notice and complaint were admitted at the October 27, 2010, hearing on the motion to consolidate as Exhibits 103 and 104 respectively. Approval of the settlement however was not on the table at the October hearing. Even were I to consider these exhibits within the context of the motion to approve settlement, as discussed below, given the dearth of particulars on the merits of the claims being made, I would still hold the Trustee has not sustained his burden of proof.

MEMORANDUM OPINION-18

expense, inconvenience and delay necessarily attending it. The motion must be denied, without prejudice to the Trustee either renegotiating the claims or bringing a second motion (to be followed by a second hearing) where the parties will be required to produce enough information to enable the court to make an informed assessment. Of course, the Trustee remains at liberty to litigate the claims.

In order to expedite administration of the case, I will require the Trustee within 90 days either to submit a renewed motion to approve a settlement or to prosecute the estate's underlying claim against the State of Oregon. The Trustee may undertake such prosecution either by filing an adversary proceeding in Bankruptcy Court or by filing proof he has intervened as plaintiff in the action pending in Marion County Circuit Court when the Chapter 7 petition was filed, or if such action is not still pending, by filing proof he has filed a new action in an appropriate non-bankruptcy forum.

**Conclusion**:

Both motions before the court will be denied, however denial of the motion to approve the settlement is without prejudice. A separate order will be entered. The above constitute my findings of fact and conclusions of law under FRBP 7052.

FRANK R. ALLEY, III
Chief Bankruptcy Judge

MEMORANDUM OPINION-19